324-0513, Hickory Wind, LLC, Appellant Titles by David Stryker v. Village of Cedar Point Appall, Appellees by Bill Porter and Employee Sherman 2nd and Employee Sherman 3rd, Intervenor Appellees by Kevin Larkin. Mr. Stryker, if you're ready, you may proceed. Thank you, Jeff. Good morning, Your Honors, and may it please the Court, Counsel. My name is David Stryker, and I represent the Appellant, Hickory Wind, LLC. Hickory Wind is planning to develop a utility or commercial-scale wind farm in an unincorporated area of southwest LaSalle County. None of the components of the planned project would be within the corporate boundaries of the Village of Cedar Point. However, certain project infrastructure would be located within a mile and a half of those corporate boundaries, and that's what brings us together here today. In 2003, when the project was under development, given the fact that certain components would be located near Cedar Point, Hickory Wind began to work with the Village to try and find an amicable way to develop the project in harmony with how the Village wanted to see itself grow and envision its extraterritorial territory. After several months of working together, and you'll notice there's several transcripts in the record of the discussions that went on before the Cedar Point officials with regard to the project, how you could possibly regulate wind energy, etc., the Village passed an ordinance that specifically banned all commercial or utility-scale wind farm development. I know you keep characterizing it that way, but they didn't completely ban it. They limited what could be placed there in terms of capacity, but are you telling us that there's no such windmill that could ever meet their requirements? There's no such commercial or utility-scale windmill, and that's what my client planned to develop, and those are windmills that develop power to be sold onto the grid. What you saw in the ordinance, Judge, was that it accepted end-user systems or systems that generated no more than 120% of the power to be used on site. What do your clients' windmills generate? Excuse me? It's a ballpark. What do your clients' windmills generate, 500%, 1,000%? I know it's going to vary based on the size of the parcel. Yes, well, again, the bogey in the ordinance is what that home would use or that farm, so we're not doing that. We would generate approximately 45 megawatts of energy as opposed to the kilowatt, the 500 kilowatt systems that you would see for a home use. I would also note, Judge, and thank you for raising that question because it was brought up at the circuit court level, but the ordinance exception for the end-user systems, the statute at issue, which is 11-1326 of the municipal code zoning, subsection A deals with the power to regulate the commercial or utility-scale systems outside of your corporate boundaries up to a mile and a half. I would point the court to subsection B. What you'll see there is that it does not allow municipalities to regulate the end-user systems in the extraterritorial territory more than X, and it was a setback. So what I would say is they had to have that exception to even minimally comply with statute. Of course, our argument here is that in passing the ordinance, Cedar Point grossly exceeded the authority that it has. And that's what brings us here today because, as you can tell, there's not a factual disagreement here. Both sides brought cross motions for summary judgment at the circuit court level. The summary judgment was entered in favor of Cedar Point and the intervener, Sherman. We would ask this court to reverse the circuit court's order and direct the circuit court to enter summary judgment in favor of it. Can you just give me some examples of regulations that you think would comply? Absolutely, Judge. And I would point this court to in the appendix, and this is appendix 213 in the record at C443 or 443, there's a transcript dated April 26, 2023. That is the transcript of the hearing. It was essentially a debate before the Cedar Point Planning and Zoning Board about what a regulatory scheme would look like. And I don't want you to take my word, Your Honor. Look to Sherman's counsel, Mr. Porter. And this begins on page 4 of the transcript and lasts through page 38. But Mr. Porter takes Cedar Point through a number of regulatory criteria, examples of which regulating shadow flicker, noise, vibration, even regulating height. And on page 38, I think the court would find it particularly instructive, and that's appendix 222 and the record 452. Mr. Porter talks about heights, and some ordinances try and limit wind turbine height to 399 feet, and that's no longer applicable with the market. He didn't think that was reasonable. He had suggested a 500-foot limit. So, Judge, on the April 26 transcript, there are a number of key debates. I think it's fair to say nobody thought that Cedar Point could, should. So this is not rhetorical, but, I mean, basically any regulation that isn't going to comport with the commercial desire to generate electricity using these windmills is going to be a regulation you're not going to accept. And I'm focusing on height. I mean, why can't the municipality say, you know what, I don't want 600-feet windmills within a mile and a half of land that we're hoping is going to ultimately be developed residentially, and this will, as a practical matter, make that idea much less attractive? Right. Is that permissible? It is not, Judge. It is permissible to pass reasonable regulations that are not arbitrary to flat-out ban wind development, which is what they did here. They did not attempt to go to the next step like Your Honor just suggested and determine, is the appropriate height limit perhaps 399 feet? But you wouldn't accept that. You would say that was a de facto prohibition. I don't agree with that. I would accept it if we thought it was reasonable and it comported with what we had worked out with them. What I would not accept is a complete prohibition. The municipality, Your Honor, did not go with the next step that you just suggested. So one of the things that we were trying to do was work with the municipality to develop the project in a manner consistent with what they wanted to see. Counsel, were you working with them for purposes of changing the 120% factor or changing the industry standards by way of the height, et cetera, or were you working with regard to the percentage of output? The 120%, Your Honor, we were not working with them on that. That was not what my— It's your minimum standard. That would be for an end-user system. It would be for a wind farm that would serve a farm, a business, or a home. We're not doing that. We are developing a wind farm that would sell power. So we did not work with them on that. What we did work with them on is the regulations holistically. We had suggested to them the height of tower that we wanted to build. The Shermans, who also live in the agricultural area outside of Cedar Point, intervened. They proposed an ordinance that they thought was reasonable. Cedar Point also went out into the market, if you will, and looked what other municipalities were doing. At the end, after compiling all that information, they never asked us if we could take a 600-foot turbine and make it 500 foot. They flat-out banned the activity completely. In doing so, that's when they greatly exceeded their statutory authority. Your Honor, the record is replete with a number of references to what a regulatory scheme could look like. According to the statute, it is regulation that they were authorized to do. I think it's important for the Court to note that a non-home-rule municipality, such as Cedar Point, only has the six enumerated powers given to them and other powers provided by statute. There are a number of instances, and we've cited those in our briefs, where municipalities are allowed to prohibit otherwise legal activities if they so choose. The video gaming example is a good one. Interestingly, and you saw this perhaps in the order, but the Circuit Court picked up on the fact that municipalities are allowed to ban commercial wind turbines within their corporate limits. I will give you that statute specifically, which is 65 ILCS 5 backslash 11-42-15. I think this provides a good contrast with the argument we're making here, which is when the General Assembly wants to give a non-home-rule municipality the power to prohibit something, it does it directly, and it did it with wind. You contrast that with the statute at issue that allows them to regulate but not prohibit. The other side of that same coin is they knew how to say you can prohibit it in your municipality. They knew how to tell the counties you cannot do anything more prescriptive than what we're saying. Correct. But in this zone, if you will, one and a half miles from the municipal boundaries, the municipalities can regulate. Yes. And they don't define regulation, but if they wanted to say you can't prohibit it, they knew how to say that. I agree with everything you said. If they wanted to say prohibit it, they could have said it. I do believe that a municipality would have slightly more flexibility than a county with regulating in that area. But again, Judge, we tried to work with them. They did not attempt to regulate. They prohibited. Their ordinance on it. De facto prohibited. I would say it's explicitly prohibited, Judge. We can't view the recital as something that... I believe it's incorporated, but the point is very clear that they're making to us, which is we've taken what you've heard. We've taken what other folks in the agricultural area have told us. We've taken that all into consideration, and we've just prohibited it. In doing so, they did not regulate. They prohibited, and they overstepped their statutory authority. What do you say to the idea that you skipped a step by not seeking a barrier? Oh, I do not give that any validity at all. Judge, we're attacking a legislative act of a municipality. I believe we went right to the circuit court, and that is the appropriate way to go. Secondly, Your Honor, again, we had been working with them for several months. After hearing otherwise perhaps reasonable regulatory schemes, they flat out prohibited the activity. For them and Cedar Point in their brief and in their argument to come back and say we should have requested a variance, one, I think that's a little bit ridiculous. Two, on a technical basis, Your Honor, it is a zoned municipality in a zoned county. They don't have extraterritorial authority. I had told their counsel I don't believe their variance process was even applicable out there. But in the end, Judge, it was a legislative act that we were challenging. I did not need to go through the Administrative Procedure Act. So you're saying there is no variance to give? I would make that as a technical argument. My primary argument would be I'm challenging an ordinance, a legislative act, and I don't need to take another step to do that. Also, Judge, not only have they exceeded their direct statutory authority, but I think that the Hawthorne line of cases is important here. And it's not just the Supreme Court case. It's also the appellate level case. And what you see there is a number of examples of the courts coming in and saying you can't pass a zoning ordinance that's effectively exclusionary for an otherwise legal activity. So here, even if there was more power than the statute gave them, they passed a flat-out prohibition on commercial wind development. Commercial wind development is, just like other examples, cement plants, outdoor movie theaters, et cetera. These are activities that are defined in statute. They're permitted in statute. They can't be otherwise excluded via a zoning ordinance. So not only did they not have the authority to pass the prohibition, they violated the Hawthorne line of cases when they passed an exclusionary ordinance. As a secondary argument, we also note that what Hawthorne and those cases tell you to do is that you, one, determine if it was exclusionary. If it is, the inquiry stops right there. Secondly, if it is arguably valid, then you would go to the preemption argument. We think this fails both, but certainly our primary argument is the facial attack on the ordinance. And there's other important case law, Your Honors, that says when a non-home-rural municipality may have stepped over its boundary, the courts must construe negatively against them what that authority is. And that specifically, Your Honors, is the decision in England v. City of Charleston. And the court quite says clearly, if there is any doubt regarding the grant of power to a non-home-rural entity, it's to be resolved against that entity. So even if there is some debate about prohibition versus regulation, that power to regulate should be construed against the non-home-rural municipality, which is what we have here. So again, thank you for your time. But we are making primarily a facial challenge against this ordinance against a municipality that did not have the authority to pass that. I'm happy to answer any questions. Mr. Stryker, we have an option in rebuttal. Thank you. Thank you, Judge. Mr. Porter. My understanding is that you and Ms. Weiler are splitting your time, and we're going to trust you to decide when that's going to happen. All right. My planning to be brief. And I'm going to take no more than five minutes, and then co-counsel for the interveners will step in. And, counsel, Your Honors, good morning. I'm just going to jump right in here. And really what this is about is the ability of a small town, Cedar Point, to regulate, not prohibit, regulate 600-plus-foot towers, 13 of them, right outside their windows. And whether that is, the points I'm going to cover, is whether they can show that the action, the Ordinance 453, is unconstitutional. And they're taking an approach that must be unconstitutional on its face. And it would be futile for us to even attempt to get a variance or some acceptance of what we want to do to the town. They're saying it more on the lines of for the town. These are 600-plus-foot towers with 100-foot blades. And since taking this case, to kind of personalize it, every time I drive around and look at the towers that are out there, those are small. If your client wanted to require shorter towers or shorter blades, they could do that. They could. But also, they could apply for a variance. And that's where I'm going to discuss in regard to whether this litigation is even right. They did not apply. They did not request a variance. No, they ran to court and said, we don't like what the town has done to regulate within 1.5 miles of its jurisdiction as allowed. And, oddly, they cite, as you pointed out, the county prohibition. The county can't regulate that, but the folks in a small town or a large town in this county can say, here's what we'd like to see. Here's what we'd like to regulate. And, as with any other zoning, if you wish, you can come in and ask for a variance. And we're not even there yet. The ordinance, as written, does de facto prohibit commercial wind farms. I mean, you're not going to commercially do something that serves the land plus 20% when it's farmland. It doesn't need any energy. I mean, as a practical matter. As written, you can say that it limits the output and the size of the windmills within 1.5 miles of town. And that's, of course, correct. But, I mean, the practical impact of that is you're not going to have commercial windmills. Well, not within 1.5 miles in that size, perhaps, but we don't know. It's up to the town. And it's up to the village board if there was a... But all I'm asking is a concession that, as written, this ordinance is not going to permit commercial wind farms within 1.5 miles. You agree with that? Yeah. And if you want a wind farm in excess of that, go 1.6 miles or a little further and park your ginormous windmills. So is that a regulation or is it a prohibition and does it matter? As written, it is a regulation and it's not a prohibition. And it does matter in regard to the case law dealing with the constitutionality of such ordinances. And I would point out, for example, Hawthorne, which council is likely going to address in what we agreed, that case doesn't deal with this as a prohibition at all. That's state preemption dealing with daycare. And that's not even on point. And secondly, just in regard to it being unconstitutional on its face, that burden is pretty heavy on the part of the appellant. And because of that, the ordinance is presumed to be constitutional. And the argument that it's unconstitutional clearly comes down to we just don't like it. We want to do this within 1.5 miles of the town. We don't like the regulation that they have. So in limiting the amount of power that can be generated from a particular windmill, what is the legislative purpose in imposing that standard? The legislative purpose appears to me to be to regulate what is within the 1.5 miles and within the town in regard to size and capacity. So you're talking about regulating what's in the town. And regulation has nothing to do with the windmill itself. No. It has everything to do with the size and capacity and what's within the ordinance 453 in regard to regulating that which was in the control of the municipality. So it sounds like your purpose is to not have any large commercial windmills within 1.5 miles. Fair. That remains to be seen. But, yeah, that could be it, that within 1.5 miles of this town do they want 600-foot windmills. What would a commercially viable windmill be acceptable? Which kind would be acceptable to the village? I don't know because it hasn't been approached. And that goes to the rightness. There hasn't been an application. When the application was made and when negotiations were made, did the village ever make any counteroffer as to the plans that were submitted? I don't have a record of that, and I did not represent the town during that negotiation of the hearings. And I can see my time is up. Okay. Thank you. Ms. Weiler. Good morning, Your Honors. May it please the Court, Catherine Weiler on behalf of the Shermans v. Intervenor-Appalooza in this case. As Mr. Porter observed, I'll be addressing two issues raised by Hickory Wind, the constitutional challenge and the preemption challenge. I appreciate that some of those issues do overlap with the questions the panel has been asking. I'll do my best to try to approach the questions from both ends. Hickory Wind has conceded that this case turns on the question of whether the village exceeded the scope of its regulatory and legislative power under the municipal wind farm statute as we've defined it in our brief, that's 65 ILCS 5 backslash 11 dash 13 dash 26, in enacting the ordinance. This Court, in addition to the issues addressed by Mr. Porter, considers whether the ordinance is preempted by Illinois law and whether the ordinance is constitutional under Illinois law. And it does satisfy both of those requirements because, as Justice Brennan, you have alluded to more than once, the municipal wind farm statute, so again, that's the statute, not the ordinance, it specifically allows for the type of ordinance at issue here, one that limits wind energy conservation systems allowed within a municipal corporate boundary or, most importantly, one and a half miles beyond it. That's the fundamental point, and the language of the statute makes that very plain. The language of the statute I left over on counsel's table, forgive me, Your Honor. Just one second. I wouldn't normally break with my argument, but I think it's fundamental to look at the actual language of the statute. What does it say? It says, quote, a municipality may regulate wind farms and electric generating wind devices within its zoning jurisdiction and within a mile and a half radius surrounding its zoning jurisdiction. Justice Davenport, this goes a little bit to your question, which was, what would be permissible? Well, under Illinois law, the General Assembly has seen fit to give villages such as Cedar Point the authority to make determinations about wind farms specifically and electric generating wind devices, so both types of devices. Now, I appreciate the Court's next question as well, is that permissible, just because the General Assembly gives permission to do it. Is the municipality then allowed to do so? The answer to that is yes, for two reasons. There's no preemption here, and there's no constitutional issue here. So let's look first at preemption. Well, preemption is the question of whether or not state law expressly preempts a municipal action, which we know from this particular statutory provision, the village is allowed to enact these types of ordinances. But in addition to that, in addition to the idea that there's no express preemption in this particular case, there are certainly two other types of preemption that could be at issue, implied field preemption and implied conflict preemption. So implied field preemption is when a comprehensive scheme of regulations implies no room for additional municipal regulation. That's what we're talking about in a case like the Olympia Fields case, where we're talking about issues related to, in Olympia Fields it was childcare. Does the village have the authority in Olympia Fields to preclude any sort of in-home childcare? In this particular case, there is no comprehensive scheme of regulation that precludes the authority that is given to the village pursuant to the municipal wind farm statutes. That's a lot in a single sentence. What I'm saying is that under Olympia Fields, the Illinois Supreme Court found implied field preemption existed. Why? Because there was a comprehensive scheme enacted pursuant to Illinois law that controlled childcare, how childcare was handled, licensing DCFS issues. And the Illinois Supreme Court said that statutory scheme, that regulatory scheme, preempts any sort of municipal ordinance that would impede or affect that regulatory scheme. So what this court looks to then is in this context, where we're talking about a municipal ordinance that regulates, not prohibits, the types of wind generating equipment allowed in the municipality. Is there any statutory scheme that preempts that field, a regulatory scheme that would preclude any sort of ordinance in this case? And the answer to that is no. Is it your position that if the village wanted to, they could actually simply say we prohibit all commercial wind farms within 1.5 miles of our municipal border? I can't give a yes or no answer to that, Judge. But I can give a maybe, and there's a reason for that. It's also in Olympia Fields. And it's because the Illinois Supreme Court in the Olympia Fields case said it is possible there may be a situation in which a complete prohibition does pass. They suggest both constitutional muster, but they're doing it in the context of preemption, that that is permissible pursuant to Illinois law. But they do not say that for sure. They don't say that. As we've discussed earlier, the legislature has used the word prohibit. For some people, they use regulated for the municipalities. Does that suggest that regulation and prohibition perhaps mean different things? They certainly do mean different things, Your Honor. So can you have a regulation that prohibits? You can have a regulation that regulates, and that's what's at issue here. There's not a prohibition. Now, counsel has argued it's a prohibition of all commercial, very large land development. And I recognize that recitals aren't always controlling, but we do have a pretty blunt recital here in terms of the village's intent, and it is incorporated by reference in the ordinance. I'm not saying it's dispositive, but it's basically telling us what their intention is. It's telling us what the provision is, big picture, looking to. Yeah, we don't want these things. But the language of the ordinance itself does not prohibit all of that, and that's what really matters here because the ordinance is. . . But isn't it de facto prohibition of commercial? Which is exactly my question. Does Cedar Point have other restrictions or ordinances that restrict activities, which for all intents and purposes denies them in their entirety? So the idea of restriction versus denial in its entirety becomes an action for the city or the village where this restriction is de facto a denial in more than one event. Sorry, I want to make sure the court. . . First, I cannot answer the question of whether the city has any other ordinances that are a de facto prohibition. I do not know the answer to that. I would defer to Mr. Porter on behalf of the village for that. What I can answer are the following two things. Number one is this ordinance is specifically designed to allow certain types of energy generating equipment that does allow the creation of energy beyond what is needed for that single parcel. Does that apply to commercial wind farms? Probably not. We certainly recognize that. But there is an allowance here. It's not an outright prohibition. And the second thing I would point to is, again, this Olympia Fields case suggests there may be circumstances in which what the court is describing, Your Honor, what you're describing is permissible. But we don't have that situation here because we do not have an outright prohibition. That's the distinction here. The last thing I would point to is, again, the straightforward language of the municipal code. This is a statutory provision, again, the municipal wind farm provision. This is not a situation where the village is enacting this type of ordinance without any sort of guidance from the General Assembly or is enacting some sort of an ordinance that is directly contrary to an existing statutory scheme. This is a situation where the village has looked directly to what the statute allows, what the General Assembly allows. And the statute that was enacted does specifically permit the regulation of wind farms. And that is a word directly from the statute. That's important because, Justice Brendan, you were asking about commercial wind farms. That language is directly here. They are allowed to enact ordinances that do regulate. So they can prohibit within their boundaries. They can regulate. They can prohibit within their boundaries. Yes, that's correct. They can regulate within 1.5 miles of their boundaries. Yes. But does that not suggest that regulation can't essentially approach a de facto prohibition? It suggests that regulations are appropriate. And one last question. I know I'm close to the end of my time. One last question I wanted to mention that I think speaks to, Justice Brendan, what you were asking, Justice Anderson. You were asking about the purpose. What is the purpose? I guess what I want to know, does this ordinance have any legislative purpose other than to stop someone from building a commercial windmill? And if so, what is it? It exists to, and this is permissible, control growth expansion and to regulate health, safety, and welfare. That's what the trial court found. And, Justice Brendan, that's what you were suggesting would be permissible. I see that my time is up. If there are any further questions from the panel. Couldn't they have furthered that purpose by limiting the height of the windmills, the size of the blades, the density of the windmills per square mile? Couldn't there have been other ways to achieve that purpose other than imposing what is a de facto ban? There may be any number of ways they could achieve that purpose. The question before the court is whether the avenue they elected to take is permissible, and the answer to that is yes. Other questions? Ms. Wyler, thank you very much. We ask that the court affirm. Thank you, Your Honors. Mr. Stryker. Thank you, Your Honors. Can I just pick up where Ms. Wyler left off? Absolutely. Your position would be that saying that these windmills should be 300 feet lower, that would be essentially a de facto prohibition as well. I wouldn't go that far, Judge. What I would say is you heard Mr. Porter talk about, well, we should be able to regulate or prohibit whatever these 600 plus foot turbines. The interesting thing is they didn't set a height limit at all, even for the 120 percent turbines. You could build a very small, tall turbine under this. What they had, to your point, Justice, and Justice Anderson, they had a whole litany of advice from Mr. Sherman, who was in opposition to the project, on what a reasonable regulatory scheme would have looked like. Height limits were there. Again, I would point you 500 feet was what was suggested. They did not follow that direction. They went off and they prohibited it, the entire activity. And you talked about, Justice Brennan, a de facto prohibition, which whether it's explicit or de facto, you certainly have a prohibition here. And to that point about de facto prohibitions, that's where I really think the Hawthorne line of cases comes in and is of great importance because it's not just the Supreme Court case. Again, it is the appellate decision that was affirmed by the Supreme Court that said if you're effectively prohibiting the activity, that is an exclusionary ordinance and can't be allowed to stand. One thing you've heard the opposition pick up on multiple times is that, well, that's not what the Supreme Court was doing when it actually took up Hawthorne. The beauty of being the Supreme Court is it can do things the way it wants to do them. What it said was it did not take issue with what the appellate court found was an exclusionary ordinance. In response to the amici, and I happen to be quite familiar with those arguments because I worked on it as a young associate, they said, well, there may be some instances in which a municipality could pass an exclusionary ordinance. We know now that they can prohibit wind and video gaming, but we need not get into that here. They just skipped right over that, what exemptions may apply and right to the fact, because we don't need to get to that because this is, in fact, preempted. What I would say to this Court is we know they can prohibit within their boundaries. We know they can regulate extraterritorially. Any of the potential exclusions the Supreme Court may have weighed in on, one, wouldn't have involved wind, and two, would not have been involved in an extraterritorial location because this ordinance not only impacts Hickory Wind, it also impacts our landowners who live in unincorporated LaSalle County, who we have agreements with who want to host turbines on their property, and Cedar Point has essentially condemned their ability to go out and do that with this ordinance. And these are residents that don't draw any services from Cedar Point. They aren't residents there, but Cedar Point's telling them what they can do to their property, and they're not authorized to make that jump. So, again, there's ample notes in the record with regard to what a reasonable regulatory scheme would look like. Cedar Point did not adopt any of those. They decided to prohibit, and in doing so, they exceeded their authority. One last comment on preemption, judges. I do believe that the comprehensive state statutes governing wind energy development would preempt a ban on wind, but that is certainly not one of our major arguments. You'll notice in Sherman's brief they actually turned our arguments around in reverse order, but it is the last one that is the primary one, which is this is a prohibition on commercial wind energy, and they're not allowed to do that. I'm happy to answer any further questions. No questions. Thank you for your time. Court thanks both sides for spirited arguments. We will take a matter under advisement and render a decision in due course.